UNITED STATES COURT OF APPEALS
FOR DISTRICT OF COLUMBIA CIRCUIT

JUN 18 2014

RECEIVED

No. 14-1112

# In the
# United States Court of Appeals
## for the
# District of Columbia Circuit

MURRAY ENERGY CORPORATION

*Petitioner,*

v.

UNITED STATES ENVIRONMENTAL PROTECTION AGENCY and REGINA A. MCCARTHY, Administrator, United States Environmental Protection Agency

*Respondents.*

On Petition for Extraordinary Writ to the
United States Environmental Protection Agency

## PETITION FOR EXTRAORDINARY WRIT
### (Prohibition of Ultra Vires Rulemaking)

Geoffrey K. Barnes
J. Van Carson
Wendlene M. Lavey
Robert D. Cheren
SQUIRE PATTON BOGGS (US) LLP
4900 Key Tower
127 Public Square
Cleveland, Ohio 44114-1304
(216) 479-8646
geoffrey.barnes@squirepb.com

*Counsel for Murray Energy Corporation*

## CERTIFICATE AS TO PARTIES, RULINGS, AND RELATED CASES

Pursuant to Circuit Rule 28(a)(1), Petitioner states as follows:

### PARTIES AND AMICI

Murray Energy Corporation is the Petitioner. The United States Environmental Protection Agency and Regina A. McCarthy, Administrator of the United States Environmental Protection Agency, are the Respondents.

### RULINGS UNDER REVIEW

This petition relates to EPA's proposed rulemaking styled *Carbon Pollution Emission Guidelines for Existing Stationary Sources: Electric Utility Generating Units*, 79 Fed. Reg. 34,830 (June 18, 2014).

### RELATED CASES

Petitioner is aware of no related cases at this time.

## DISCLOSURE STATEMENT

Pursuant to Federal Rule of Appellate Procedure 26.1 and D.C. Circuit Rule 26.1, Petitioner provides the following disclosure:

Murray Energy Corporation is a corporation organized and existing under the laws of the State of Ohio. No publicly-held corporation holds an ownership interest of 10% or more of Murray Energy Corporation. Murray Energy Corporation's parent corporation is Murray Energy Holdings Co.

Murray Energy Corporation is the largest privately-owned coal company in the United States and the fifth largest coal producer in the country, employing approximately 7,300 workers in the mining, processing, transportation, distribution and sale of coal. In 2014, Murray Energy Corporation expects to produce 65 million tons of coal from twelve active coal mining complexes in six States. Murray Energy Corporation also owns 2 billion tons of proven or probable coal reserves in the United States.

## TABLE OF AUTHORITIES

### CASES

*Am. Elec. Power Co. v. Conn.*
  131 S.Ct. 2,527 (2011) ............................................................................ 8

*Am. Petroleum Inst. v. SEC*
  714 F.3d 1329 (D.C. Cir. 2013) ............................................................. 20

\* *Colonial Times v. U.S. District Court (Gasch)*
  509 F.2d 517 (D.C. Cir. 1975) ................................................. 22–23, 27

*Harrison v. PPG Industries, Inc.*
  446 U.S. 578 (1980) ......................................................................... 1, 29

\* *Leedom v. Kyne*
  358 U.S. 184 (1958) .................................................................... 1, 23, 28

*Lexmark Int'l, Inc., v. Static Control Components, Inc.*
  134 S. Ct. 1377, 1386 (2014) ............................. Standing Addendum at 1

\* *McCulloch v. Sociedad Nacional*
  372 U.S. 10 (1963) ........................................................................ 23, 28

\* *Meredith v. Fed. Mine Safety & Health Review Comm'n*
  177 F.3d 1,042 (D.C. Cir. 1999) .................................................... 24, 28

\* *New Jersey v. EPA*
  417 F.3d 574 (D.C. Cir. 2008) ........................................................... 7–8

*Schlagenhauf v. Holder*
  379 U.S. 104 (1964)………...................................................................... 23

\* *Sierra Club v. Thomas*
  828 F.2d 783(D.C. Cir. 1987) ....................................................... 24, 28

*Stephan v. United States*
  319 U.S. 423 (1943) ........................................................................... 20

*Ukiah Adventist Hosp. v. FTC*
  981 F.2d 543 (D.C. Cir. 1992) ....................................................... 1, 21

*White Stallion Energy Center, LLC v. EPA*
  No. 12-1100 (D.C. Cir. Apr. 15, 2014) ................................................. 4

Note: Authorities upon which we chiefly rely are marked with asterisks.

**STATUTES**

\* All Writs Act
28 U.S.C. § 1651(a) .................................................................... 1, 22, 29

\* Clean Air Act, as amended
CAA § 111(a)(1); 42 U.S.C. § 7411(a)(1) ........................................... 5, 9
CAA § 111(d); 42 U.S.C. § 7411(d) ......................................5–6, 8–9, 19
CAA § 112(a)(7); 42 U.S.C. § 7412(a)(7) ............................................. 16
CAA § 112(b)(2); 42 U.S.C. § 7412(b)(2) ............................................ 16
CAA § 112(c); 42 U.S.C. § 7412(c)....................................................... 3
CAA § 112(d); 42 U.S.C. § 7412(d) ..............................................5, 9, 16
CAA § 112(n)(1)(A); 42 U.S.C. § 7412(n)(1)(A)...........................3, 7, 19
CAA § 129(b); 42 U.S.C. § 7429(b) ...................................................3, 19
CAA § 179(a)(3); 42 U.S.C. § 7509(a)(3) .............................................. 5

\* Clean Air Act, as amended in 1970
1970 Clean Air Act § 111(a)(1)............................................................ 13
1970 Clean Air Act § 111(b)................................................................ 13
1970 Clean Air Act § 111(b)(1)(A)....................................................... 13
1970 Clean Air Act § 111(d).................................................... 14, 15, 18
1970 Clean Air Act § 112(a)(1)............................................................ 13
1970 Clean Air Act § 112(b)(1)(B) ...................................................... 13
1970 Clean Air Act § 302(h)................................................................ 13

\* Clean Air Act, as amended in 1977
1977 Clean Air Act § 111(a)(1)(C)....................................................... 14
1977 Clean Air Act § 111(d)(1)................................................. 14, 15, 18
1977 Clean Air Act § 111(d)(2)............................................................ 14
1977 Clean Air Act § 112 .................................................................... 15

Other
1 U.S.C. § 204(a) .. .............................................................................. 20

**REGULATIONS AND OTHER AUTHORITIES**

\* A LEGISLATIVE HISTORY OF THE CLEAN AIR AMENDMENTS OF 1970
(Comm. Print 1974).......................................................................11–12

\* A LEGISLATIVE HISTORY OF THE CLEAN AIR ACT AMENDMENTS OF 1990
(Comm. Print 1993) .....................................................................17–19

EPA, *Regulatory Impact Analysis for the Final Mercury and Air Toxics Standards (2011)* ............................................................................................. 3–4

*National Emission Standards for Hazardous Air Pollutants From Coal- and Oil-Fired Electric Utility Steam Generating Units and Standards of Performance for Fossil-Fuel-Fired Electric Utility, Industrial-Commercial-Institutional, and Small Industrial-Commercial-Institutional Steam Generating Units*
77 Fed. Reg. 9,304 (Feb. 16, 2012) ....................................................... 3

*National Emission Standards for Hazardous Air Pollutants: Coal- and Oil-Fired Electric Utility Steam Generating Units*
40 C.F.R. Part 63 Subpart UUUUU...............Standing Declaration ¶ 14
40 C.F.R. § 63.9984(b)......................................................................... 4

# CONTENTS

JURISDICTION AND STANDING ............................................................. 1

STATEMENT OF RELIEF SOUGHT ......................................................... 2

STATEMENT OF ISSUE PRESENTED ...................................................... 2

STATEMENT OF BACKGROUND AND FACTS ...................................... 2

I.   In 2012, EPA Promulgated a National Emission Standard for
     Power Plants under Section 112 of the Clean Air Act ............................... 2

II.  EPA Now Seeks to Also Mandate State-by-State Standards for
     Existing Power Plants under Section 111(d) of the Act ............................. 4

STATEMENT OF WHY WRIT SHOULD ISSUE ...................................... 6

I.   The Mandate Is Beyond EPA's Power Because It Would Require
     State-by-State Emission Standards for Existing Power Plants
     Already Subjected to National Standards .................................................. 6

     A.  The Text of the Clean Air Act Expressly Prohibits
         Double Regulation by EPA ................................................................ 6

     B.  The Express Prohibition in Section 111(d) Is Consistent with
         the Structure of the Act ..................................................................... 8

     C.  The Act's Evolution Since 1970 Shows the Import and Purpose
         of the Section 111(d) Restriction ....................................................... 10

II.  A Writ Prohibiting the Mandate Is Uniquely Appropriate in this Case .... 22

     A.  An Extraordinary Writ Is an Available Vehicle for Stopping
         an Ultra Vires Action by an Agency ................................................. 22

     B.  A Writ Prohibiting EPA's Ultra Vires Mandate Is Necessary
         and Appropriate ............................................................................... 24

     C.  This Court Is the Proper Forum for Issuing a Writ to EPA
         Prohibiting the Unlawful Mandate .................................................... 29

CONCLUSION ...................................................................................... 29

## JURISDICTION AND STANDING

This Court has jurisdiction to review EPA final actions taken under the Clean Air Act that are nationally applicable. Clean Air Act § 307(b)(1); *Harrison v. PPG Indus., Inc.*, 446 U.S. 578 (1980). EPA's proposed rule announced on June 2, 2014, calls for a dramatic overhaul of the United States energy sector. More specifically, EPA proposes to set State-specific aggregate emissions well below existing emission rates, and directs every State to develop plans for complying with EPA's mandate. Thus, EPA's rule is nationally applicable. Additionally, where this Court's jurisdiction to review an action once finalized would be exclusive, this Court also has exclusive jurisdiction to grant relief from non-final agency action. *Ukiah Adventist Hosp. v. FTC*, 981 F.2d 543, 547 (D.C. Cir. 1992).

Under the All Writs Act, a Court "may issue all writs necessary or appropriate in aid of [its] jurisdiction[] and agreeable to the usages and principles of law." 28 U.S.C. § 1651(a). Thus, a Court may by writ prohibit an agency from taking an action beyond its power—an ultra vires action—even before that action is final. *See, e.g.*, *Leedom v. Kyne*, 358 U.S. 184, 190–91 (1958).

Evidence and arguments in support of Petitioner's standing to seek a writ are provided in the attached Petitioner Standing Addendum.

## STATEMENT OF RELIEF SOUGHT

Petitioner seeks a writ prohibiting EPA's ultra vires rulemaking styled *Carbon Pollution Emission Guidelines for Existing Stationary Sources: Electric Utility Generating Units*, 79 Fed. Reg. 34,830 (June 18, 2014).

## STATEMENT OF ISSUE PRESENTED

Given the express language in Section 111(d) of the Clean Air Act that EPA may only mandate state-by-state standards for emissions that are not "from a source category which is regulated under section 112," does EPA have the legal authority to mandate state-by-state emission standards for existing coal-fired power plants when it has already promulgated a national emission standard for those same power plants under Section 112 of the Clean Air Act?

## STATEMENT OF BACKGROUND AND FACTS

EPA promulgated a national emission standard under Section 112 of the Clean Air Act for electric utility steam generating units ("power plants") in 2012. EPA is now pursuing a second rulemaking under Section 111(d) of the Act mandating state-by-state standards applicable to existing power plants. However, the earlier rulemaking renders the subsequent rulemaking unlawful.

## I.   IN 2012, EPA PROMULGATED A NATIONAL EMISSION STANDARD FOR POWER PLANTS UNDER SECTION 112 OF THE CLEAN AIR ACT

On February 16, 2012, EPA promulgated one of the most expensive regulations in the history of the United States, a national emission standard for power plants, using EPA's authority under Section 112 of the Clean Air Act.

*National Emission Standards for Hazardous Air Pollutants From Coal- and Oil-Fired Electric Utility Steam Generating Units and Standards of Performance for Fossil-Fuel-Fired Electric Utility, Industrial-Commercial-Institutional, and Small Industrial-Commercial-Institutional Steam Generating Units*, 77 Fed. Reg. 9,304 (Feb. 16, 2012). As part of this rulemaking, EPA made the decision to regulate power plants using a national emission standard under Section 112 of the Act rather than rely on other programs to achieve emission reductions at power plants.[1]

Every covered power plant in the nation must meet the emission limits contained in this standard. The standard was, as Section 112 of the Act requires, designed to maximize emission reductions while taking costs into account. *Id.* at 9307. EPA decided the maximum emission reduction that power plants can afford will cost $9.4 billion dollars **per year**. EPA, *Regulatory Impact Analysis for the Final Mercury and Air Toxics Standards* at 3-13 (2011) ["A*ir Toxics Rule Regulatory Impact Analysis"*]. This Court recently upheld the

---

1. The Clean Air Act requires EPA to elect whether or not to issue national emission standards for power plants under Section 112. CAA § 112(n)(1)(A). In contrast, the Act directly requires, rather than gives EPA a choice, that existing incinerators not be regulated under the Section 112 national emission standards program and instead must be regulated by mandating state-by-state emission standards under Section 111(d). CAA § 129(b). With the exception of incinerators and, due to the election granted in Section 112(n)(1)(A), the potential exception of power plants, Congress directed EPA to issue national emission standards for all major sources—those that emit in excess of statutorily specified thresholds—and for all other sources that "present[] a threat of adverse effects to human health or the environment (by such sources individually or in the aggregate) warranting regulation under" the Act's Section 112 national emission standard program. CAA § 112(c).

standard in *White Stallion Energy Ctr., LLC v. EPA*, No. 12-1100 (D.C. Cir. Apr. 15, 2014). In doing so, the Court also upheld EPA's discretionary decision to issue a national emission standard for power plants under Section 112. *Id.* at 16–36. EPA acknowledges that its national emission standard for power plants will force many coal-fired units to shut down. EPA projects that the national standard will, by itself, result in the retirement of 4,700 megawatts of coal-fired generating capacity. *Air Toxics Rule Regulatory Impact Analysis* at 6A-8. That is nearly fourteen percent of the nation's total coal-fired generating capacity. *See id.* at 6A-8, 2-1. EPA projects that the rest of the coal-fired fleet will decide to invest millions of dollars to comply rather than shut down, but there is no guarantee that they will do so.

The deadline to comply with the national emission standard, absent an approved one-year extension, is April 16, 2015. 40 C.F.R. § 63.9984(b). With the deadline to comply with the national standard looming, the nation's power plants must now decide whether to invest millions of dollars in their coal-fired power plants or to shut down.

## II.    EPA NOW SEEKS TO ALSO MANDATE STATE-BY-STATE STANDARDS FOR EXISTING POWER PLANTS UNDER SECTION 111(D) OF THE ACT

As utilities across the country decide whether to shut down or invest many millions at coal-fired power plants, EPA has launched a second rulemaking, now under Section 111(d) of the Clean Air Act, requiring that States design and issue state-by-state emission standards for greenhouse gas emissions which EPA chose not to include in its comprehensive national

standards for existing power plants issued in 2012. *Carbon Pollution Emission Guidelines for Existing Stationary Sources: Electric Utility Generating Units*, 79 Fed. Reg. 34,830 (June 18, 2014). Just as must any national emission standard under Section 112, any state-by-state emission standard mandated under Section 111(d) must maximize emission reductions in light of costs. CAA § 111(a)(1); CAA § 111(d).

Under the rarely used provisions of Section 111(d), EPA issues guidelines to the States rather than standards. However, each State must then design and issue a standard in conformance with EPA's guidelines. If a State fails to do so, or does not do so in a manner to EPA's satisfaction, EPA will design and issue a standard for that State. CAA § 112(d)(2). Importantly, the proposal calls for States to submit plans within one year of promulgation of the mandate. 79 Fed. Reg. at 34,592. Further, EPA may assert that it has authority under Section 179 of the Clean Air Act to impose substantial financial penalties on any state that fails to comply with the mandate. CAA § 179(a)(3).

EPA's mandate under Section 111(d) of the Clean Air Act calling for the development of state-by-state emission standards for existing power plants, however, is unlawful. The Clean Air Act expressly prohibits EPA from mandating state-by-state standards for existing sources that are already subject to national standards: EPA's authority is limited to mandating standards for emissions that are not "from a source category which is regulated under section 112" of the Act. CAA § 111(d)(1). Here, existing power plants are already subject to the national emission standard recently upheld by this Court.

- 5 -

## STATEMENT OF WHY WRIT SHOULD ISSUE

### I. THE MANDATE IS BEYOND EPA'S POWER BECAUSE IT WOULD REQUIRE STATE-BY-STATE EMISSION STANDARDS FOR EXISTING POWER PLANTS ALREADY SUBJECTED TO NATIONAL STANDARDS

The mandate is beyond EPA's power—an unlawful ultra vires action. Because existing power plants are already subject to national emission standards, the Clean Air Act expressly prohibits EPA from mandating state-by-state emission standards for existing power plants. The need for prohibiting double regulation is evident from the structure of the Clean Air Act's emission standard programs. Moreover, the Act's evolution since 1970 confirms that ignoring this important prohibition would disrupt Congress's careful balance between national and state control and jeopardize existing sources in a manner Congress consistently avoided.

### A. The Text of the Clean Air Act Expressly Prohibits Double Regulation by EPA

Section 111(d) of the Clean Air Act authorizes EPA to mandate state-by-state emission standards for existing sources. CAA § 111(d). However, this authority is limited to mandating standards for emissions that are not "from a source category which is regulated under section 112" of the Act. *Id.* Section 112 of the Act authorizes EPA to issue national emission standards. Thus, once a source category is regulated under section 112, EPA may not mandate state-by-state emission standards for that source category. As a result, existing sources can be subjected to national standards **or** mandated state-by-state standards, but they cannot be subjected to national standards **and** mandated

state-by-state standards. This choice given to EPA by Congress is consistent with Section 112(n)(1)(A) of the Act, which directs EPA to elect whether or not to issue national emission standards for power plants under the Act's Section 112 program. CAA § 112(n)(1)(A) ("The Administrator shall regulate electric utility steam generating units under this section, if the Administrator finds such regulation is appropriate and necessary . . . .").

Indeed, in *New Jersey v. EPA*, this Court vacated a state-by-state standard mandate for existing power plants because existing power plants were merely **listed** for regulation under the Act's Section 112 national emission standard program. 517 F.3d 574, 583 (D.C. Cir. 2008); *see* 65 Fed. Reg. 79,825, 79,826 (Dec. 20, 2000) (EPA categorization of coal-fired power plants as part of a "source category" under Section 112). In vacating EPA's Section 111(d) mandate in 2008, this Court relied upon the text of Section 111(d). Moreover, this Court vacated the standard even though EPA had not yet issued actual standards for power plants under Section 112 and even though neither the listing decision nor the decision to regulate power plants using national standards rather than by mandating state-by-state standards had yet been subject to judicial review. This Court's decision in *New Jersey v. EPA* leaves no doubt that EPA's **promulgation** of national emission standards for power plants in 2012 under Section 112 renders the mandate of state-by-state standards for existing power plants beyond EPA's power.[2]

---

2. That EPA might foreclose itself from issuing a mandate under Section 111(d) by issuing a national emission standard under Section 112 is consistent with

That EPA chose not to regulate carbon emissions as part of its Section 112 rulemaking has no bearing on the Congressional prohibition contained in Section 111(d) against dueling Clean Air Act regulation. The unambiguous words of Section 111(d) exclude from EPA's authority the power to issue "standards of performance for any existing source for **any** air pollutant . . . emitted from a source category which is regulated under [Section 112]." CAA § 111(d)(1) (emphasis added). Thus, Congress has directed that EPA may not regulate **any** air pollutant through the state-by-state mandate program of Section 111(d) if the existing source category is regulated under Section 112.

EPA must concede, as it did before this Court in *New Jersey v. EPA*, that "if [power plants] remain listed under section 112 . . . the [mandate] . . . must fall." 517 F.3d at 583. Now, not only are power plants merely listed, they are actually regulated under Section 112.

B. **The Express Prohibition in Section 111(d) Is Consistent with the Structure of the Act**

The structure of the Clean Air Act does not abide simultaneously

---

the Supreme Court's holding in *American Electric Power v. Connecticut* that federal common law was displaced by the Act because the Court explicitly held that delegation of authority "displaces federal common law" even if that authority is never actually exercised. 131 S.Ct. 2,527, 2,538–39 (2011). Further, the Supreme Court noted that the Act prohibits mandating state-by-state standards for existing sources that are already subjected to a national emission standard. The Court observed that "[t]here is an exception" to EPA's authority to mandate state-by-state standards: "EPA may not employ [the mandate program] if existing sources of the pollutant in question are regulated under [the national standard program]." *Id.* at 2,537 n.7.

subjecting existing sources to state-by-state standards and national standards because double regulation would unduly jeopardize their economic viability as the standards would independently maximize emission reduction expenses. Simultaneous, uncoordinated design of national and state-by-state standards maximizing emission reductions would put these sources at grave risk.

An EPA mandate of state-by-state standards under Section 111(d) must require the States, or EPA if the States do not, to design and impose emission standards determined to "reflect[] the degree of emission limitation achievable through the application of the best system of emission reduction which (taking into account the cost of achieving such reduction and any nonair quality health and environmental impact and energy requirements) . . . has been adequately demonstrated." CAA § 111(a)(1); CAA § 111(d).

A national emission standard under Section 112 must be designed to "require the maximum degree of reduction in emissions" determined to be "achievable" by EPA "taking into consideration the cost of achieving such emission reduction, and any non-air quality health and environmental impacts and energy requirements . . . through the application of measures, processes, methods, systems or techniques" and must meet statutory stringency floors. CAA § 112(d).

Thus, both the state-by-state standard and the national standard programs require consideration of costs on the one hand and maximum reductions on the other. Plainly, the Act orders the designers of these standards to go as far as possible in reducing emissions without threatening the economic

viability of sources. Subjecting an existing source category to both state-by-state standards and a national standard would set the designers at odds and result in standards requiring more expenditures than existing sources can possibly afford.

### C. The Act's Evolution Since 1970 Shows the Import and Purpose of the Section 111(d) Restriction

The Act's text unambiguously forecloses EPA from issuing the mandate, and the structure of the Act demonstrates why that foreclosure is necessary. The evolution of the Act's emission standard programs provides additional confirmation by showing the import and purpose of the prohibition. The Act's evolution shows that the emission standard programs reflect a careful balance between national and state control, especially with respect to existing sources, and eliminates any suggestion that Section 111(d) is ambiguous in any way or requires agency interpretation.

Today, EPA has authority to impose nationwide standards on emissions from existing sources that harm either the public health or the environment. But this was not always so, and it was Congressional reluctance to give EPA this power in 1970 that led to the development of EPA's authority to mandate state-by-state emission standards for existing sources in the first place. When Congress finally granted EPA authority to impose nationwide standards on existing sources whose emissions harm either the public health or the environment in 1990, Congress restricted EPA's authority to mandate state-by-state emission standards to those existing sources for which EPA did not have

or did not exercise the authority to impose national emission standards.

### 1.    The 1970 Clean Air Act Amendments

On February 9, 1970, President Nixon proposed amending the Clean Air Act to authorize national emission standards "for facilities that emit pollutants extremely hazardous to health" and "for selected classes of new facilities which could be major contributors to air pollution." A LEGISLATIVE HISTORY OF THE CLEAN AIR AMENDMENTS OF 1970 at 1498, 1505 (Comm. Print 1974).[3] To this end, the Administration proposed a bill that would add a new provision to the Clean Air Act authorizing rules that would require existing sources to install controls for emissions found to be "extremely hazardous to health." *Id.* at 1,489–92. In response, members of the Senate and members of the House introduced two different alternative bills that would authorize regulation of new sources but would not authorize national emission standards for existing sources. *Id.* at 920–24, 1,467–68.

After hearings on the three different proposed bills, members of the Senate introduced another alternative to the Administration bill, which passed in the Senate and would provide the basis for the emission standard programs in the final bill. *Id.* at 392. This bill authorized national emission standards for

_____

3. Citations to the historical development of the Clean Air Act are to the pages of the comprehensive committee print compilations. The materials cited are described in the text, leaving out bill and section numbers because they are not essential to the historical demonstration of the import and purpose of the double regulation prohibition. None of the materials referenced are statements by legislators or committees.

**new** sources for emissions found to "cause or contribute to the endangerment of the public health and welfare," *id.* at 553–60, and authorized national emission standards for **existing** sources of emissions found to be "hazardous to the health of persons," *id.* at 565–69. These two provisions embodied President Nixon's proposal to authorize emission standards for new sources and sources of emissions extremely hazardous to human health. A third provision went further, authorizing national emission standards for existing sources of emissions that "ha[ve] or may be expected to have an adverse effect on public health," even if not extremely hazardous. *Id.* at 560–65.[4]

While the Houses were in conference, the Administration observed in a letter to Congress that this third provision provided "general authority to set emission standards, down to zero levels, for all facilities" and noted this rendered the special provision for extremely hazardous emissions unnecessary. *Id.* at 211, 219.

The final bill approved in conference, the 1970 Clean Air Act, eliminated the proposed expansive authority to establish national emission standards for existing sources of any emissions that have an adverse effect on public health. Instead, the final bill included authority to mandate state-by-state emission standards for existing sources of emissions that "cause[] or contribute[] to the

---

4. The original committee print version of the provision would have gone even further than this. It would have authorized national emission standards for existing sources of emission that "ha[ve] or may be expected to have an adverse effect on health *and welfare.*" *Id.* at 656 (emphasis added).

endangerment of public health or welfare."[5] 1970 Clean Air Act § 111(d); 1970 Clean Air Act § 111(b)(1)(A). The 1970 Clean Air Act also authorized national emission standards for new sources of such emissions. 1970 Clean Air Act § 111(b). As for national standards for existing sources, the 1970 Clean Air Act limited EPA's authority to nationally regulate only those existing source emissions that "may cause, or contribute to, an increase in mortality or an increase in serious irreversible, or incapacitating reversible, illness." 1970 Clean Air Act § 112(a)(1).

The 1970 Clean Air Act imposed different procedures for designing the national emission standards for hazardous emissions, the national emission standards for new sources, and the state-by-state standards for existing sources. The national emission standards for extremely hazardous emissions would be designed so as to "provide[] an ample margin of safety to protect the public health." 1970 Clean Air Act § 112(b)(1)(B). The national emission standards for new sources would be designed so as to "reflect[] the degree of emission limitation achievable through the application of the best system of emission reduction which (taking into account the cost of achieving such reduction) . . . has been adequately demonstrated." 1970 Clean Air Act § 111(a)(1). The design method for state-by-state emission standards for existing sources was

_____

5. The 1970 Act defined welfare to "include[], but . . . not [be] limited to, effects on soils, water, crops, vegetation, man-made materials, animals, wildlife, weather, visibility and climate, damage to and deterioration of property, and hazards to transportation, as well as effects on economic values and on personal comfort and well-being." 1970 Clean Air Act § 302(h).

left to the states. 1970 Clean Air Act § 111(d). Notably, the only instance in which the 1970 Act required maximum emission reductions in light of costs was for new sources.

Through it all, Congress hesitated to authorize national emission standards for existing sources while showing no such hesitancy to authorize national emission standards for new sources. And for non-hazardous emissions, Congress rejected national standards for existing sources in favor of mandated state-by-state standards.

### 2.   The 1977 Clean Air Act Amendments

In 1977, Congress took a significant step away from the 1970 Act's deferential approach to regulation of existing sources. Where the 1970 Act left to the States the manner in which the state-by-state standards would be designed, the 1977 Act required States to design mandated standards so as to maximize emission reductions while taking costs into consideration. 1977 Clean Air Act § 111(a)(1)(C); 1977 Clean Air Act § 111(d)(1). In this change, Congress subjected existing sources to standards designed to require maximum emission reductions in light of costs for the first time under the Clean Air Act. Still, Congress maintained distinctions between new and existing sources in two ways. First, the standards for existing sources would still be set by the States in the first instance. Second, Congress authorized the standard designer "to take into consideration . . . the remaining useful life of the existing source to which [the] standard applies." 1977 Clean Air Act § 111(d)(1)–(2).

While the 1977 Act subjected existing sources to maximum state-by-state standards in light of costs, the national emission standards for existing sources were still (1) limited to extremely hazardous emissions and (2) designed so as to provide an ample margin of safety rather than to maximize reductions in light of costs. 1977 Clean Air Act § 112.

The Clean Air Act continued not to subject any existing source simultaneously to multiple standards designed to maximize emission reductions in light of costs. Existing sources would be subject to state-by-state standards set to achieve maximum emission reductions in light of costs and also subject to national standards for extremely hazardous emissions set to achieve minimum safety margins. Further, as provided in the 1970 Act, the national and state-by-state standards would not cover the same emissions.[6] Thus, the Act still largely deferred existing source regulation to the States.

### 3.    The 1990 Clean Air Act Amendments

In 1990, Congress dramatically expanded the national emission standard program for existing sources to cover emissions "which present, or may present, through inhalation or other routes of exposure, a threat of adverse human health effects . . . or adverse environmental effects" and to require that EPA design the emission standards to maximize emission reductions while

---

6. The 1970 Act and the Act as amended in 1977 excepted from the authority to mandate state-by-state standards emissions "included on a list published under section . . . 112(b)(1)(A)," the national emission standard program. 1970 Clean Air Act § 111(d)(1); 1977 Clean Air Act § 111(d)(1).

- 15 -

considering costs. CAA § 112(b)(2); CAA § 112(d).[7] In the course of this expansion of federal regulation of existing sources, Congress enacted language to prohibit mandating state-by-state standards for existing sources that are subject to the expanded national emission standard program. At the same time, Congress ensured that the States would continue to play a primary role in regulating some categories of existing sources rather than eliminating the Section 111(d) state-by-state emission standard program altogether.

To start, the House and Senate each passed bills that fundamentally altered the national emission standard program for existing sources. The bills replaced the program requiring national standards for existing sources designed to "provide[] an ample margin of safety to protect the public health" for emissions "reasonably anticipated to result in an increase in mortality or an increase in serious irreversible, or incapacitating reversible, illness." In its place, the bills required EPA to design national emission standards so as to "require the maximum degree of reduction in emissions" determined to be "achievable" while "taking into consideration the cost of achieving such

_____

7. The amendments provided that "adverse human health effects" covered substances "including, but not limited to, substances which are known to be, or may reasonably be anticipated to be, carcinogenic, mutagenic, teratogenic, neurotoxic, which cause reproductive dysfunction, or which are acutely or chronically toxic." CAA § 112(b)(2). The amendments defined "adverse environmental effects" as "any significant and widespread adverse effect, which may reasonably be anticipated, to wildlife, aquatic life, or other natural resources, including adverse impacts on populations of endangered or threatened species or significant degradation of environmental quality over broad areas." CAA § 112(a)(7).

emission reduction," non-air quality "health and environmental impacts," and "energy requirements." A LEGISLATIVE HISTORY OF THE CLEAN AIR ACT AMENDMENTS OF 1990 at 2133–34, 4422 (Comm. Print 1993). The bills further required that the standards meet elaborate minimum stringency requirements based on the performance of existing sources. *Id.* at 2135–36, 4423–25.

The House and Senate bills differed as to what emissions would be covered. The House bill covered emissions that are:

> known to cause or . . . reasonably . . . anticipated to cause in humans one or more of the following:
>     (i) cancer or developmental effects, or
>     (ii) serious or irreversible—
>         (I) reproductive dysfunctions,
>         (II) neurological disorders,
>         (III) heritable gene mutations,
>         (IV) other chronic health effects,
> or
>         (V) adverse acute human health effects.

*Id.* at 2128–29. The Senate bill, as would the final 1990 Act, far more broadly covered emissions that "present, or may present . . . a threat of adverse human health effects . . . or adverse environmental effects," defining the adverse effects almost exactly as would the final Act. *Id.* at 4414–15. Both bills also included a list of substances for which the standards would be required.

Accordingly, both the House and Senate bills as passed would authorize for the first time national emission standards for existing sources designed so as to maximize emission reductions in light of costs. The House bill would have limited that authority to emissions affecting human health while the Senate bill

- 17 -

would have permitted standards for emissions only affecting the environment even if the emissions had no effect on human health. Still, both bills as passed contained a program very much like the program that Congress removed and replaced by the Section 111(d) mandate program in the 1970 Act conference that would have authorized EPA to issue national emission standards for existing sources of emissions not found to be extremely hazardous to human health. Doing so raised a question. What would become of the mandate program? Different answers were contained in each bill.

In the Senate bill, the text of the Section 111(d) mandate program was altered to refer to the expanded Section 112 national standard program, but was otherwise unchanged. *Id.* at 4534. Under that approach, the state-by-state mandate program would have nearly been eliminated by the expansion of the national program. Emissions regulated under the expanded national emission standard program could not be regulated under the mandate program because the Act excluded from the mandate program all emissions regulated under the national program. 1970 Clean Air Act § 111(d)(1); 1977 Clean Air Act § 111(d)(1). As amended, there would be no significant coverage gap between the mandate program and the national program, leaving nothing for the mandate program to regulate. Even for those existing sources left unregulated by the national program, the mandate program could not regulate the nationally regulated emissions.

The Senate bill contained only one exception to this elimination of the Section 111(d) state-by-state mandate program. The Senate bill required that

- 18 -

EPA regulate existing incinerators using the mandate program rather than the national program, and specified a list of emissions for the state-by-state mandated incinerator standards to cover. A LEGISLATIVE HISTORY OF THE CLEAN AIR ACT AMENDMENTS OF 1990 at 4,538–40, 4,556 (Comm. Print 1993). By listing emissions for the standards to cover, the Senate bill would override the general exclusion of nationally regulated emissions from the mandate program.

Meanwhile, the House bill explicitly preserved the mandate program by amending the program to **permit** regulation of nationally regulated emissions and to **prohibit** regulation of nationally regulated existing source categories. *Id.* at 1,979. The House bill also included a provision that gave EPA discretion to decline to regulate one category of sources under the national program if such regulation was not "appropriate and necessary"—power plants. *Id.* at 2,149. Thus, EPA could choose to regulate existing power plants under the national program, and if and only if EPA *chose not to* regulate power plants under the national program could EPA mandate state-by-state standards for power plants.

In conference, the House and Senate agreed to include in the final bill— the 1990 Clean Air Act—the Senate bill incinerator provision, the House bill power plant provision, and the House bill amendment to the mandate program. *Id.* at 593, 572, 481; *see* CAA § 129(b); CAA § 112(n)(1)(A); CAA § 111(d)(1).

The final bill also contains the Senate bill's conforming amendment of the reference to the expanded national emission standard program. *Id.* at 588.

Any perceived clerical error in writing up a conforming amendment does not displace the unambiguous terms of Section 111(d). The Senate merely sought to bring up-to-date a cross-reference in Section 111(d) to Section 112(b)(1)(A). Because other substantive amendments eliminated Section 112(b)(1)(A) entirely, and replaced it with Sections 112(b)(1), 112(b)(2) and 112(b)(3), the clerical amendment was designed solely to account for those changes. This non-substantive amendment has no impact on the substantive amendment that changed the restriction in Section 111(d) from its pre-1990 focus on hazardous air pollutants regulated under Section 112. In fact, the clerical correction was unnecessary and thus need not be given any effect. *See Am. Petroleum Inst. v. SEC*, 714 F.3d 1329, 1336-37 (D.C. Cir. 2013).

The wording of the published United States Code of Laws should be given full effect. By statute and due to separation of power considerations, the determinations of the House Office of Law Revision Counsel—operating under the authority of the Speaker of the House—in applying "cut-and-bite" amendments to existing law may only be questioned where they are objectively inconsistent with the contents of the Statutes at Large. 1 U.S.C. § 204(a). The "Code of Laws of the United States current at any time shall … establish prima facie the laws of the United States." 1 U.S.C. § 204(a). That prima facie evidence is displaced only where the U.S. Code is "inconsistent" with the Statutes at Large. *See Stephan v. United States,* 319 U.S. 423, 426 (1943). There is no inconsistency when reading a substantive amendment found in the Statutes at Large amongst a list of other substantive amendments on the one

hand, and a non-substantive conforming amendment located much later in the Statutes at Large among a list of purely clerical changes titled "Conforming Amendments" on the other.

Importantly, the Clean Air Act as amended in 1990 again continued to avoid authorizing EPA to subject any existing source simultaneously to multiple standards designed to maximize emission reductions in light of costs. Having finally provided for extensive national emission standards for existing sources, Congress opted to maintain the state-by-state standard mandate program for those sources not subject to national standards. And having preserved this role for the state-by-state mandate program, Congress further decided incinerators would be subject only to the state-by-state mandate program but gave EPA discretion to decide to which program power plants would be subject, national or state-by-state. Congress's special treatment of incinerators and power plants recognizes that these categories of existing sources are often older facilities that offer essential public or quasi-public services to their communities, frequently operating at little or no profit. Thus, regulation of existing incinerators and power plants poses implications for the proper balance between state and federal control that regulation of other sources does not. Accordingly, Congress maintained a greater role for States in establishing standards for incinerators and gave EPA discretion to maintain a greater role for States in establishing standards for power plants. But Congress in no way empowered EPA to subject power plants (or any other category of existing sources) to **both** national and mandated state-by-state standards. To do

so would make no sense, for the mandate program has always been a substitute and alternative for the very authority over existing sources that Congress finally gave EPA in 1990.

## II.    A WRIT PROHIBITING THE MANDATE IS UNIQUELY APPROPRIATE IN THIS CASE

Under ordinary circumstances, the federal executive branch proceeds to final action before the federal judiciary reviews its conduct. Yet the federal judiciary has undoubted authority to prohibit unlawful actions before they are taken in extraordinary circumstances. This is such a circumstance.

### A.    An Extraordinary Writ Is an Available Vehicle for Stopping an Ultra Vires Action by an Agency

Under the All Writs Act, this Court "may issue all writs necessary or appropriate in aid of its jurisdiction[] and agreeable to the usages and principles of law." 28 U.S.C. § 1651(a). This Court has long recognized its expansive powers to engage in expedited review under the All Writs Act when such review promotes the administration of justice. *See, e.g., Colonial Times v. U.S. District Court (Gasch)*, 509 F.2d 517, 525–26 (D.C. Cir. 1975).

As explained in *Colonial Times* in the context of the availability of mandamus to a trial court notwithstanding the normal rule that a party may appeal only a final judgment, the "true test is whether the trial court had any legal power to act or refuse to act as it did." 509 F.2d at 523. The exercise of an "appellate supervisory power" over the lower court is a "more modern ground for the issuance of mandamus," *id.* at 524, but is grounded in Supreme Court

jurisprudence. In holding that mandamus was available, this Court applied the "principle of *Schlagenhauf*" in concluding that mandamus lies to review an issue of first impression in order to settle new and important problems. *Id.* at 524-25 (discussing *Schlagenhauf v. Holder*, 379 U.S. 104, 111 (1964)). "*Schlagenhauf* authorizes departure from the final judgment rule when the appellate court is convinced that resolution of an important, undecided issue will forestall future error in trial courts, eliminate uncertainty and add importantly to the efficient administration of justice." *Id.* at 524.

Similarly, an extraordinary writ is available when it is an administrative agency (rather than a trial court) acting beyond its power notwithstanding the general principle that affected parties may only appeal final agency actions (rather than final judgments). Thus, while proceedings under the All Writs Act to challenge non-final agency action may be relatively rare, a Court can and should issue a writ prohibiting an agency from taking an action beyond its power—an ultra vires action—before it is final.

In *Leedom v. Kyne*, the Supreme Court held that a court could strike down a non-final action taken "in excess of [the agency's] delegated powers and contrary to a specific prohibition." 358 U.S. 184, 188, 190–91 (1958). And in *McCulloch v. Sociedad Nacional*, the Supreme Court held that a court could enjoin an agency from taking unlawful non-final actions when those actions involve "public questions particularly high in the scale of our national interest" because such questions are "a uniquely compelling justification for prompt judicial resolution of [a] controversy." 372 U.S. 10, 16–17 (1963).

- 23 -

This Court, too, has recognized that appropriate circumstances warrant relief from non-final agency actions. In *Sierra Club v. Thomas*, this Court, in clarifying a line of previous cases, held that a court can provide "interlocutory review of an unreasonable delay claim" when interlocutory review is "necessary to protect" the court's "prospective jurisdiction." 828 F.2d 783, 790 (D.C. Cir. 1987) (quoting *Telecomms. Research & Action Ctr. v. FCC*, 750 F.2d 70, 75–76 (D.C. Cir. 1984)). In that case, this Court explained that "this interlocutory intervention is necessary either because a substantive statutory right would be effectively denied as a result of agency delay . . . and such delay cannot be remedied when reviewing the final order because the clock cannot be turned back." *Id.* at 792 n.66. Additionally, in *Meredith v. Fed. Mine Safety & Health Review Comm'n*, this Court held that a court may review non-final agency action that meets the requirements of the collateral order doctrine—separability, unreviewability, and conclusiveness. 177 F.3d 1,042, 1,050 (D.C. Cir. 1999).

## B. A Writ Prohibiting EPA's Ultra Vires Mandate Is Necessary and Appropriate

Here, a writ prohibiting EPA from issuing the unlawful mandate is appropriate in furtherance of this Court's ultimate jurisdiction to review final agency action. This writ targets the fundamental legal underpinnings of EPA's action.[8] This writ is not a challenge to the substantive detail of the mandate,

---

8. Petitioner submits this Petition for Extraordinary Writ without waiving numerous other challenges to the proposed mandate, including the methodology used by EPA to set state-specific carbon reduction targets,

and is not dependent on a technical or factual understanding of the lengthy mandate to the States. This writ is not even dependent on the ultimate version of the mandate that EPA will eventually promulgate in a final rulemaking. Indeed, the details of the mandate do not matter. This writ is, instead, a challenge to the EPA's legal authority to go down this path at all. It is purely a question of law. And EPA cannot resolve its lack of authority by revising the proposed mandate during the normal rulemaking development process, since the legal infirmaries targeted by this Petition can only be redressed by total withdrawal of the rule (with no future replacement rule). There is no other "fix" to EPA's ultra vires act than to instruct EPA not to proceed.

Moreover, that instruction to EPA needs to occur now. Petitioner and others will suffer irreparable injury if this Court does not provide immediate relief. First, utility companies right now are in the midst of making decisions about the future viability of their coal-fired power plants in the face of impending compliance deadlines under the 2012 Section 112 rule that will cost millions to meet. The proposed mandate adds to that cost evaluation the prospect of even more expenditures in order to comply with an independent

---

EPA's authority to impose standards beyond specific source categories and instead to control the entire supply and demand of energy in the United States, and EPA's unprecedented attempt to commandeer states into establishing regulatory regimes opposed by Congress in in violation of the Constitutional rights of the states, to name a few. The narrow legal issue presented by this Petition, however, will moot those other issues, since the entire proposed rule rests on Section 111(d), which explicitly prohibits EPA's attempted action.

standard that also strives to achieve maximum emission reductions. The power plants face an April 16, 2015 compliance deadline under the 2012 rule, and prior to that time need to decide whether or not to seek a compliance extension. In other words, utilities must make a decision over the coming months as to each of their coal-fired power plants whether to proceed with significant investments or to begin the process of shutting down (or converting) the power plant. They must now take into account the uncertainties of a Section 111(d) mandate as a part of that analysis. With the specter of the mandate hanging over them, utilities face uncertainty and many coal-fired power plants may shut down based on the risk that the mandate could be upheld, no matter its final form, and they would be forced to invest millions more. Meanwhile, utilities must grapple with the potential wasted investment to comply with the earlier Section 112 requirements.

Second, States right now must begin development of plans designed to meet the requirements of the Section 111(d) mandate. Although the President has announced that States will have one year from the date of the final mandate to submit their plans, each State must begin that process now given the complexities involved as it tries to balance intra-state power supply and demand, including reliability concerns, and concerns about economic growth and employment. In some cases, States have to enact enabling legislation as a preliminary step in order to abide by the demands by EPA. All of this effort takes time. Simply put, States cannot wait for the final mandate before getting started on a task that is truly a complete overhaul of the nation's production and

use of energy. To do so would risk the inability to meet the deadline, turning over critical policy decisions about the future of existing coal-fired power plants to EPA. To avoid these potential consequences, States must immediately devote tremendous time and resources toward an effort that, ultimately, stems from an ultra vires act by EPA.

These circumstances are distinguishable from the typical rulemaking primarily due to the massive undertaking that is required by the mandate, and the massive financial impact upon the power plants and the coal industry supplying those power plants. Waiting until final agency action to obtain a judicial determination that EPA had no authority to issue the mandate in the first place will impose significant harm. The legal issue will never be clearer. Indeed, the legal issue presented by this writ transcends the details in the mandate and the inevitable debates that will ensue over the "right" energy policy for the United States with regard to climate change concerns. Because the mandate is beyond EPA's power and prohibited by the Act in the first instance, all of the effort expended on other potentially unlawful or problematic aspects of the rule during "ordinary" rulemaking and final action appeals will be a waste of resources.

These circumstances more than qualify as appropriate for relief by a writ prohibiting EPA from issuing the unlawful mandate. Analogizing to the test laid out by this Court in *Colonial Times* in the context of a trial court acting beyond its power, first, the issue of EPA's authority under Section 111(d) of the Act when the same source category has already been regulated under Section 112, is

an important issue that must be expeditiously resolved. 509 F.2d at 525. Second, given the massive undertaking called for by the proposed mandate, "there is an undeniable need to forestall future error and uncertainty" in the availability of Section 111(d) as a basis for greenhouse gas emission regulation of coal-fired power plants, as well as for future rulemaking efforts by EPA. *Id.* And third, clearly resolution of this issue is "significant" to finalization of the proposed rule, since the writ would result in the withdrawal of the proposed mandate. *Id.*

The analysis in the administrative context flows directly from the long history of the extraordinary writ authority recognized by the Supreme Court and this Court. As in *Leedom*, EPA acts beyond its authority. As in *McCulloch*, the issue is of urgent national importance. As in *Thomas*, only an immediate remedy can prevent a substantial portion of the harm facing the nation's power plants that must decide whether to invest millions or shut down coal fired power plants by the national standard's compliance deadline. And as in *Meredith*, each of the three requirements of the collateral order doctrine is satisfied. In short, the circumstances in this case present a compelling justification for prompt judicial resolution. A federal agency has commenced a rulemaking of unprecedented scope with significant implications for federal and state relations and the national economy, irrespective of the details of the final rule. Such a critical circumstance offers its own "uniquely compelling justification for prompt judicial resolution of [a] controversy." *McCulloch*, 372 U.S. at 17.

**C. This Court Is the Proper Forum for Issuing a Writ to EPA Prohibiting the Unlawful Mandate**

When, as here, a writ is appropriate, it may be had only from a proper court because writs issued under the All Writs Act may only be issued by courts "in aid of their respective jurisdictions." 28 U.S.C. § 1651(a). Where this Court's jurisdiction to review an action once finalized would be exclusive, this Court has exclusive jurisdiction to grant relief from non-final agency action. *Ukiah Adventist Hosp. v. FTC*, 981 F.2d 543, 547 (D.C. Cir. 1992). This Court alone has jurisdiction to review nationally applicable EPA final actions taken under the Clean Air Act. CAA § 307(b)(1); *Harrison v. PPG Indus., Inc.*, 446 U.S. 578 (1980). Therefore, this Court, and this Court alone, may issue a writ prohibiting EPA from issuing the mandate.

## CONCLUSION

The Clean Air Act's text, structure, and evolution unambiguously prohibit EPA from subjecting existing sources to multiple emission standards that are independently designed to maximize emission reductions in light of costs. This Court is ultimately tasked with judicially reviewing EPA's mandate. In the ordinary course, that review would follow EPA's final promulgation of the mandate. But as the stakes are so high, and delay will waste enormous amounts of industry, state, and federal resources and result in increased coal-fired power plant retirements that cannot be later remedied, this petition requests an extraordinary writ in aid of this Court's undoubted jurisdiction over EPA's mandate.

- 29 -

Respectfully, relief from this Court at this time is warranted. Accordingly, a writ of prohibition to EPA against the mandate should issue.


Dated: June 18, 2014

                              Respectfully submitted,


                              Geoffrey K. Barnes
                              J. Van Carson
                              Wendlene M. Lavey
                              Robert D. Cheren
                              SQUIRE PATTON BOGGS (US) LLP
                              4900 Key Tower
                              127 Public Square
                              Cleveland, Ohio 44114-1304
                              (216) 479-8646
                              geoffrey.barnes@squirepb.com

No. _____

# In the
# United States Court of Appeals
## for the
# District of Columbia Circuit

MURRAY ENERGY CORPORATION

*Petitioner,*

v.

UNITED STATES ENVIRONMENTAL PROTECTION AGENCY and REGINA A.
MCCARTHY, Administrator, United States Environmental Protection Agency

*Respondents.*

On Petition for Extraordinary Writ to the
United States Environmental Protection Agency

## PETITIONER STANDING ADDENDUM

Geoffrey K. Barnes
J. Van Carson
Wendlene M. Lavey
Robert D. Cheren
SQUIRE PATTON BOGGS (US) LLP
4900 Key Tower
127 Public Square
Cleveland, Ohio 44114-1304
(216) 479-8646
geoffrey.barnes@squirepb.com

*Counsel for Murray Energy Corporation*

# CONTENTS

ARGUMENT IN SUPPORT OF STANDING

DECLARATION OF ROBERT E. MURRAY

## ARGUMENT IN SUPPORT OF STANDING

As the largest privately-held coal producer and the fifth largest coal producer in the United States, Murray Energy Corporation ("Murray Energy") has standing to seek a writ prohibiting EPA from issuing a rule that would jeopardize the existence of many of the nation's coal-fired power plants and thereby directly harm the domestic coal industry, including Murray Energy.

To have standing to litigate in federal court, a petitioner "must have suffered or be imminently threatened with a concrete and particularized 'injury in fact' that is fairly traceable to the challenged action of the defendant and likely to be redressed by a favorable judicial decision." *Lexmark Int'l, Inc., v. Static Control Components, Inc.*, 134 S. Ct. 1377, 1386 (2014). As further supported in the Declaration of Robert E. Murray, attached as an Addendum to this Petition, EPA's proposed mandate imminently threatens to result in the shuttering or conversion of coal-fired power plants and thereby imminently threatens Murray Energy's core business – the mining of coal supplied to those power plants.

Prohibiting EPA from going any further with its proposal to cut carbon emissions under Section 111(d) of the Clean Air Act would immediately redress the injury facing Murray Energy. Murray Energy does not have the luxury of waiting for finalization by EPA of its mandate to the States in another year. Right now, States have no choice but to move forward with the massive undertaking of evaluating the proposed mandate and developing State-

specific plans in conformance with the mandate. These plans will not just impose numeric carbon emissions limitations, or even impose specific emission control technologies. Rather, EPA's mandate tells each State to examine holistically the entire energy sector within the State, addressing energy end-use as well as power generation.

Moreover, power plants already face an April 16, 2015, compliance deadline under EPA's separate national emission standard for power plants promulgated in 2012 and must make decisions now about the future of their coal-fired power plants under the 2012 rule. By EPA's own projections, that standard alone will result in 4,700 megawatts of coal-fired utility retirements. Even if EPA's proposed mandate does not become final for another 1–2 years, and even if another year or two passes before the individual State plans required by the mandate become effective, power plants face a decision right now under the 2012 rule. Why invest the millions of dollars needed to comply with that 2012 rule knowing that the carbon reduction mandate will cause the utility to shut down or convert that coal-fired power plant in which it just invested? Power plants have no choice but to incorporate projections about the carbon reduction mandate into their determinations now. In other words, even though EPA's proposed mandate is not yet a final action, the announcement alone of yet another anti-coal rule has an immediate—and significant—effect today on the energy sector and the companies who supply coal to the energy sector.

Accordingly, Murray Energy Corporation has standing to seek a writ prohibiting EPA's unlawful action.

## DECLARATION OF ROBERT E. MURRAY

BEFORE ME, the undersigned authority, personally appeared Mr. Robert E. Murray, who after being duly sworn states as follows:

1.      My name is Robert E. Murray. I am the Founder, Chairman, President, and Chief Executive Officer of Murray Energy Corporation.

2.      Prior to founding Murray Energy Corporation, I was President and Chief Executive Officer of The North American Coal Corporation, which is now part of Nacco Industries, Inc.

3.      Murray Energy Corporation began in 1988 with the purchase of a single continuous mining operation in the Ohio Valley mining region with an annual output of approximately 1.2 million tons per year.

4.      In 2014, Murray Energy Corporation will produce approximately 65 million tons of coal from twelve active coal mining complexes. We currently employ approximately 7,300 people.

5.      Murray Energy Corporation is the largest privately-held coal company in the United States, the largest underground coal mine operator in the United States, and the fifth largest coal producer in the United States determined by combined annual coal production.

6.      Murray Energy Corporation's operations are located in six States: Illinois, Kentucky, Ohio, Pennsylvania, Utah and West Virginia.

7.      Murray Energy Corporation also owns or controls approximately 2.0 billion tons of proven or probable coal reserves in the United States,

strategically located near our customers, near favorable transportation, and high in heat value.

8.    Additionally, Murray Energy Corporation owns about 80 subsidiary and support companies directly or indirectly related to the domestic coal industry, including numerous coal transportation facilities such as coal transloading facilities, harbor boats, towboats and barges.

9.    The vast majority of the coal produced by Murray Energy Corporation is supplied to coal-fired electric utility generating units (i.e., power plants), providing affordable energy to households and businesses across the country.

10.    In 2013, we sold coal to domestic customers located in nine states. The substantial majority of those customers operate electric power plants located throughout the United States.

11.    Coal production in the central Appalachian region is already down approximately 43% compared to 2008 levels. The American Coalition for Clean Coal Electricity ("ACCCE") recently concluded that 421 coal-fired power plants in the United States are being shut down or converted to a different fuel source. This represents nearly 63,000 megawatts of electric generating capacity. Of this total, ACCCE found that 299 are being shut down and 39 are being converted due to EPA policies, for a total of 338 units representing over 51,000 megawatts of electric generating capacity.

12.    By way of example, and not necessarily all-inclusive, Murray Energy Corporation previously sold coal to the following power plants, each of

which has been shut down or slated for closure: First Energy Corporation's Hatfield Ferry Power Station, Mitchell Power Station, and Eastlake Plant; NRG's Indian River Generating Station; Appalachian Power Company's Philip Sporn Plant; GDF Suez Energy North America's Mount Tom Station; and Dairyland Power Cooperative's Alma Generating Station.

13.    The shift away from coal has and will have a direct and significant impact on the primary business of Murray Energy Corporation.

14.    I have been briefed on the Administration's proposed plan to cut carbon emissions at coal-burning power plants, announced by EPA on June 2, 2014 (*Proposed Carbon Pollution Emission Guidelines for Existing Stationary Sources: Electric Utility Generating Units, 40 CFR Part 60, Subpart UUUU*).

15.    It is my understanding that EPA's plan announced on June 2, 2014, expressly contemplates the shifting of fuel at power plants from coal to other fossil fuels, and the shifting of energy supply from fossil fuel power plants to nuclear power plants and renewable energy sources such as wind and solar. Thus, EPA's June 2 plan calls for the shutting down and/or conversion of even more coal-fired power plants than already planned as a result of this piling on of regulation after regulation directly aimed at coal.

16.    It is my understanding that the re-writing of energy policy in the United States is beginning right now, with States calling for stakeholder meetings and beginning the monumental task of overhauling the energy market (both supply and demand).

17.     Murray Energy Corporation and its employees depend upon the presence of a stable and continuing domestic market for coal. Every coal fired power plant that is shut down (or converted) affects the financial bottom line of Murray Energy Corporation and enough shutdowns threaten the existence of Murray Energy Corporation and the well paid and well benefited jobs of our 7,300 employees.

Further Affiant sayeth naught.

By: *Robert E. Murray*

Robert E. Murray, Affiant

Subscribed and sworn to me this 18th day of June 2014.

*Vickie C. Gray*

Notary Public
My Commission Expires: 4/30/2017

## CERTIFICATE OF SERVICE

I hereby certify that the foregoing PETITION FOR EXTRAORDINARY WRIT

and PETITIONER STANDING ADDENDUM have been served by Petitioner,

Murray Energy Corporation, by United States first-class mail this 18th day of

June 2014, upon each of the following:

> Regina A. McCarthy, Administrator
> United States Environmental Protection Agency
> Ariel Rios Building, 1101A
> 1200 Pennsylvania Ave., NW
> Washington, D.C. 20460

> United States Environmental Protection Agency
> Correspondence Control Unit
> Office of General Counsel (2344-A)
> 1200 Pennsylvania Ave., NW
> Washington, D.C. 20460

Dated: June 18, 2014                     Respectfully submitted,

Geoffrey K. Barnes
J. Van Carson
Wendlene M. Lavey
Robert D. Cheren
SQUIRE PATTON BOGGS (US) LLP
4900 Key Tower
127 Public Square
Cleveland, Ohio 44114-1304
(216) 479-8646
geoffrey.barnes@squirepb.com

*Counsel for Murray Energy Corporation*